IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>v.<br><br>SIOSAIA TAKAI,<br><br>Defendant. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No.  2:11-cr-00542-CW<br><br>Judge Clark Waddoups |

Following the court's Memorandum Decision and Oder dated May 18, 2012 (the "Order") [Dkt. No. 73] denying Defendant's request for a *Franks* hearing, Defendant moved the court to reopen the issue and reconsider granting Defendant a *Franks* hearing. (Def.'s Mot. Re-open Ev. Hrg. [Dkt. No. 74] and Def.'s Renewed Mot. for *Franks* Hrg. [Dkt. No. 94].) Defendant also filed a Motion to Suppress statements made by Defendant in a confession to police and evidence obtained upon a search of Defendant's home. [Dkt. Nos. 47 & 95.] The court refers to its previous Order [Dkt. No. 73] for general background facts. For the reasons discussed below, the court denies Defendant's renewed motion for a *Franks* hearing and denies in part and grants in part Defendant's Motion to Suppress.

## BACKGROUND

During the day of June 15, 2011, in the course of investigating the armed robbery and shooting at the Redwood Road 7-Eleven convenience store that occurred in the early morning hours of June 15, 2011, detectives and officers reviewed video surveillance footage from that robbery and from another incident that had occurred about an hour earlier at a nearby 7-Eleven

store located on California Avenue. In the California Avenue incident, surveillance footage shows Defendant speaking at length with the clerk about what appears to be cans of chewing tobacco while Defendants' associates purchase beer and are also seen hiding cans of beer in their clothing and stealing them. Detective Merino, a gang unit detective familiar with Defendant, clearly identified Defendant as the perpetrator talking with the clerk in the theft of beer from the California Avenue 7-Eleven store. Comparing that footage with the footage from the robbery and shooting at the Redwood Road 7-Eleven store, Detective Merino was also able to identify Defendant as a suspect in the Redwood Road 7-Eleven robbery and shooting.

Based on this identification of Defendant, in the early evening hours of June 15, 2011, at least a dozen gang unit detectives, investigating detectives, and other law enforcement officers met to discuss the robbery and Defendant. Gang unit detectives familiar with Defendant and the various gangs active in the area, including gangs with which Defendant was known to be associated, informed Detective Spangenberg and the other officers present that Defendant was violent and considered to be armed and dangerous. Teams were then dispatched to search known hangouts for Defendant so that Defendant could be taken into custody for the theft at the California Avenue 7-Eleven store and for questioning relating to the Redwood Road robbery and shooting. One of those addresses was a location known as "The Garage" on Pacific Avenue. Detectives Wiley and Kobayashi were assigned to stake out The Garage for any sign of Defendant or his known associates.

Meanwhile, based on the violence of the Redwood Road robbery, in which the suspect shot the clerk in the face for no apparent reason, Detective Spangenberg made an emergency application to AT&T for the GPS information on two phones that police believed Defendant may have been using. Gang unit detectives had informed him that Defendant was known to be violent

and believed to be currently armed and dangerous. Based on his own past experience dealing with the gangs with which Defendant was believed to be associated, Detective Spangenberg was also aware that the "beer run robbery" had been one of the signature crimes known to be committed by such gangs. As a result, Detective Spangenberg believed Defendant may be in the process of preparing for or undertaking further such violent robberies.

From the results of the cellphone pinging request, Detective Spangenberg learned that one of the phones was pinging in the area of The Garage location that was already being staked out by Detectives Wiley and Kobayashi. At around 11:30 p.m., the detectives observed three adult males leaving that location and, upon approaching in their car to get a closer look, recognized Defendant from the mugshot Detective Spangenberg had showed them. Detective Wiley confronted Defendant as he tried to walk away into the yard of a nearby home, identified himself as a police officer, and asked Defendant if he would speak to him. Defendant complied and was patted down. He said he did not have any identification and then falsely gave police his brother's name, Billy Takai. Two further detectives then arrived on the scene and correctly identified Defendant as Siosaia Takai rather than Billy. Defendant was taken into custody and interviewed by detectives in the early hours of the morning of June 16, 2011.

Detective Merino informed Defendant of his *Miranda* rights and interviewed Defendant for an hour and a half. Defendant did not appear impaired by drugs or alcohol and did not appear to suffer from any physical or mental impairment. In the interview, Defendant denied involvement in the Redwood Road robbery/shooting. Defendant was then booked into jail for the theft at the California Avenue store.

A week later, Defendant was interviewed again by law enforcement officers, this time by Detective Coats together with Special Agent Quirk of the FBI. Defendant was informed of his

*Miranda* rights and then during the interview confessed to the Redwood Road 7-Eleven robbery and to shooting the clerk in the face. Defendant now seeks suppression of this confession and any evidence seized in the search of his apartment on June 16, 2011.

## DISCUSSION

I.       **Renewed Motion for *Franks* Hearing**

Defendant has still not satisfied his initial burden to be granted an evidentiary hearing in support of his challenge to the validity of the affidavit used to obtain the search warrant[1] for Defendant's home. The search provided evidence linking him to the robbery. To be entitled to an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154, 171 (1978), the Defendant must make an initial showing that statements in the affidavit were deliberately false or made with a reckless disregard for the truth. "Allegations of negligence or innocent mistake are insufficient." *Id*. The court previously found that Defendant was not entitled to an evidentiary hearing under *Franks* because he "has not offered sufficient proof that any of the specific portions of the affidavit alleged to be false were made with the requisite intent to warrant an evidentiary hearing." (Order at 3 [Dkt. No. 73].) Nevertheless, the court allowed Defendant to probe substantially into these issues at an evidentiary hearing on August 21, 2012 on his separate Motion to Suppress. (*See generally* Tr. Ev. Hrg. 8/21/12 [Dkt. No. 92].)

Based on the testimony heard at that hearing, the court now rules out any intentional or deliberate falsehood on the part of Detective Spangenberg in his preparation of the search warrant affidavit. Although, as the court noted previously, some wording in the affidavit "may have been less than careful" (Order at 6), the evidence does not support a contention that Detective Spangenberg intentionally or deliberately included inaccurate or misleading information. In fact, the court is not inclined to find that the Detective's paraphrase or summary

---

[1] Search Warrant No. 1090081 issued by the Third District Court of the State of Utah on June 16, 2011.

of, or inference from, the tips was in fact inaccurate or misleading and will not "second guess the judgment of the state judge who signed the warrant." (Order at 5.) Instead, the court acknowledges the chaotic nature of the police investigation that was proceeding at full pace mere hours after a violent convenience store robbery. For example, Detective Spangenberg testified that "I remember somebody yelling out a tip that they got. It's a very chaotic situation, you have to understand that. People have different roles, and everybody's working, everybody's on the phone trying to track this guy down, and it's a very chaotic situation, so people yelling things out. And I remember Detective Flores yelling out that he got a tip, I remember him getting a call transferred to him from dispatch, I don't know if it's the same tip, I don't know. I wasn't fielding calls that day." (Tr. Ev. Hrg. 8/21/12, at 25:3-12 [Dkt. No. 92].) Detective Spangenberg appears to have conscientiously prepared the search warrant affidavit in the thick of this chaotic investigation starting at around 3:00 a.m. on July 16, 2012. (*Id.* at 29.) There is no basis for a finding that information in the affidavit was deliberately false.

Defendant has also continued to fall short in his initial burden of proving that a "reckless disregard for the truth" contributed to statements in the search warrant affidavit. *See Franks*, 438 U.S. at 171. Defendant has not provided "evidence that the [affiant] in fact entertained serious doubts as to the truth of his allegations . . . [or] circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994). Substantively, Defendant's argument revolves primarily around the question of whether Detective Spangenberg knew before he wrote the search warrant affidavit that tipster/witness Julie Kuma, one of Defendant's girlfriends, had washed his soiled pants worn during the robbery after giving him a ride home the night of the robbery.[2] "The standards of deliberate falsehood

---

[2] Procedurally, Defendant takes the posture of arguing why it is in the interest of judicial economy and not prejudicial to the prosecution to "reopen" the *Franks* hearing. The court dismisses this approach without

and reckless disregard set forth in *Franks* apply to material omissions, as well as affirmative falsehoods." *United States v. Cooper*, 654 F.3d 1104, 1128 (10th Cir. 2011). Defendant would have the court take the view that if Detective Spangenberg knew Kuma washed the pants and did not include that fact in the affidavit, it was a material omission that constituted reckless disregard for the truth justifying a *Franks* hearing. Defendant elicited testimony on this point during the evidentiary hearing and the court considers the evidence complete on this point. The testimony, however, was inconclusive.

Contrary to Defendant's argument that Detective Coats, who interviewed Julie Kuma on June 15, informed Detective Spangenberg that she had washed the pants before he started writing the search warrant affidavit in the early hours of the morning on June 16 (Def.'s Renewed Mot. for *Franks* Hrg. 2 [Dkt. No. 94]), the record at best shows ambiguity about this chain of events. Detective Coats testified that he does not remember specifically discussing Kuma's statement that she had washed Defendant's pants with Detective Spangenberg when he informed Detective Spangenberg generally about Kuma's identification of "Spin" as the Defendant in her interview with Detective Coats. (Tr. Ev. Hrg. 8/21/12, at 88 [Dkt. No. 92].) But more importantly, in light of the prevailing legal standard, the court finds that even if Detective Spangenberg had included this information in the affidavit, it does not create a new information matrix that would give the court any cause to second guess the state court judge's decision to sign the search warrant based on the affidavit. As argued by the Government, there is no reason to believe that the state court judge would have discounted Julie Kuma's statements identifying Defendant as "Spin" and relating the events of Defendant asking her for a ride and changing his clothes in her car if an extra sentence about Kuma subsequently washing those pants had also been included. To the

consideration because it denied Defendant a *Franks* hearing in the first place; the evidentiary hearing in which Defendant probed these issues was specifically related to the Motion to Suppress.

contrary, the court agrees with the Government that this would have more likely increased her credibility in the state court judge's eyes because it would constitute a further statement against interest. Accordingly, the court denies Defendant's renewed motion for a *Franks* hearing.

## II.     Motion to Suppress

Defendant moved to suppress evidence obtained as a result of the warrantless cell pinging of Defendant, the actions of police in arresting Defendant on June 15, 2011, the interrogations of Defendant on June 16, 2011 and June 22, 2011, and the search of Defendant's apartment and evidence seized during that search. The court will address (A) the question of warrantless cellphone pinging and related issues separately from (B) the balance of Defendant's Motion to Suppress.

### A.  Warrantless Cellphone Pinging

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. Nevertheless, "the Fourth Amendment's commands, like all constitutional requirements, are practical and not abstract." *United States v. Barajas*, 2013 U.S. App. LEXIS 4475, at *16 (10th Cir., March 4, 2013) (quoting *United States v. Ventresca*, 380 U.S. 102 (1965)). And "the Fourth Amendment's concept of an 'unreasonable' intrusion into one's personal affairs, by its very nature, is not stuck in the amber of the year 1791." *In re United States Order Authorizing the Release of Historical Cell-Site Info.*, 736 F. Supp. 2d 578, 595 (E.D.N.Y. 2010, Orenstein, Mag. J.). Defendant moves this court to find that the police's warrantless cellphone tracking through GPS "pinging" technology violated the Fourth Amendment.

Defendant notes that "[t]he question of the legality of warrantless Cell Site Location Information . . . is a developing area of law." (Def.'s Mem. Supp. Mot. Suppr. 5 [Dkt. No. 95].) However, Defendant cites predominantly to cases involving *historical* Cell Site Location Information ("CSLI"), arguing that "the trend among the courts is to reject" claims that individuals have no expectation of privacy in cell phone records or in information that the individual voluntarily turns over to third parties. (*Id.*) Contrary to Defendant's argument on this point, however, it appears that "[a] majority of courts . . . have concluded that the acquisition of historical cell site location data pursuant to the Stored Communications Act's specific and articulable facts standard does not implicate the Fourth Amendment, regardless of the time period involved." *United States v. Graham*, 846 F. Supp. 2d 384, 389 (D. Maryland 2012, Bennett, J.) (citing cases for majority position and finding, contrary to the position of a minority of courts, that "the Fourth Amendment, as currently interpreted, does not contemplate a situation where government surveillance [of historical CSLI] becomes a 'search' only after some specified amount of time").[3] A minority of courts, on the other hand, have found that "government acquisition of historical cell site location data *over a prolonged period of time* can violate the Fourth Amendment if not acquired pursuant to a warrant supported by probable cause." *Id.* at 388, 390 (citing cases for the minority position) (emphasis added).[4]

---

[3] *Graham* concerned the Government's application to two different magistrate judges pursuant to the Stored Communications Act ("SCA"), 18 U.S.C. § 2703, for a total of 235 days of *historical* CSLI and concluded that the CSA, "as drafted, provides adequate privacy protections for historical cell site location data—and if the arc of technological improvement (or the implementation of that technology by the government) should be altered in a way that does infringe a person's legitimate expectation of privacy, the solution is properly for the legislature to address." Id. at 390 (citing *United States v. Jones*, 132 S. Ct. 945, 964 (2012) (Alito, J., concurring)).

[4] The minority position differs not in finding that the warrantless recourse to historical CSLI is itself a search for Fourth Amendment purposes, but rather that, if *cumulative* historical CSLI records are obtained showing a totality of a suspect's movements over a long period of time (some courts have referred to 30 days as a touchstone), this becomes a violation of the Fourth Amendment under an exception to the third-party disclosure doctrine. *See In the Matter of an Application.* . . . ("Garaufis 2011"), 809 F. Supp. 2d 113, 126 (E.D.N.Y. 2011, Garaufis, J.) (considering requests for 113 days of historical CSLI). Judge Garaufis found that "Americans view the expectation of privacy in certain aspects of one's cell-phone communication as normatively reasonable." *Id.* n.7. Thus, "an exception to the third-party-disclosure doctrine applies here because cell-phone users have a reasonable expectation

But the cases Defendant cites relating to historical CSLI do not speak directly to the issue presently before the court. Although Defendant acknowledges that the present situation involves Section 2702 of the Stored Communications Act (the "SCA") relating to obtaining CSLI in emergencies rather than Section 2703, which allows the Government to apply to the court for an Order directing cellphone service providers to release historical CSLI in furtherance of an investigation, his analysis primarily focuses on the latter. (*See* Def.'s Mem. Supp. Mot. Suppr. 5-7 [Dkt. No. 95].) But obtaining real-time CSLI and "pinging" feedback, particularly in emergency situations pursuant to 18 U.S.C. § 2702, falls under a different analytical framework. Historical CSLI obtained pursuant to 18 U.S.C. § 2703 is not at issue here; in this case, law enforcement relied on 18 U.S.C. § 2702, the SCA's provision for obtaining GPS cellphone pinging data from cellphone service providers.

### 1.    *Emergency Requiring Disclosure under 18 U.S.C. § 2702(c)(4)*

On the evening of June 15, 2011 in the midst of a fast moving investigation that had been underway since the early morning hours of that day, teams of law enforcement officers including gang unit detectives were dispatched to search known hangouts for Defendant, who the officers and detectives believed, based on reliable information from gang unit detectives, was armed and dangerous. Once these teams left to begin their respective stakeouts, Detective Spangenberg prepared and submitted an emergency application to AT&T for the GPS pinging data from two phones that police believed Defendant was using. The SCA, 18 U.S.C. § 2701 et seq., generally prohibits disclosure of the contents of any communications stored electronically except as provided in the Act. A court order is required, absent an applicable exception, to obtain disclosure of such information. *See, e.g.*, 18 U.S.C. § 2703(d) (permitting the Government to

---

of privacy in cumulative cell-site-location records, despite the fact that those records are collected and stored by a third party." *Id.* at 126.

obtain a court order based on a showing of "specific and articulable facts," though not requiring probable cause, for the release of such information); *see also Graham*, 846 F. Supp. 2d at 398.

Nevertheless, the SCA specifically allows a service provider to disclose customer records "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of information relating to the emergency." 18 U.S.C. § 2702(c)(4). This provision of the SCA must cover CSLI to the same extent that the SCA applies to CSLI in the context of Section 2703(d) because Section 2702(a)(3) employs the same language, "a record or other information pertaining to a subscriber to or customer of such service." *See Graham*, 846 F. Supp. 2d at 396 (noting that it is "well established" that CSLI is included under Section 2703(d)). Defendant acknowledges that Detective Spangenberg requested the GPS pinging data on this basis but argues with reference to Section 2703 cases concerning applications for historical CSLI that a warrant would be required to obtain such information. (Def.'s Mem. Supp. Mot. Suppr. 6 [Dkt. No. 95].)[5] Defendant also recognizes *United States v. Gilliam*, No.11-cr-1083, 2012 U.S. Dist. LEXIS 130248 (S.D.N.Y., Sept. 12, 2012), a case in which the court specifically considered an emergency situation under Section 2702(c)(4) and found that based on exigent circumstances, officers did not need to obtain a warrant to obtain GPS pinging data from the service provider and use it to locate the suspect. (*Id.* at 7.) But whereas *Gilliam* found that "the potential exploitation of a minor" in a case where the defendant was suspected of prostituting a minor across state lines "is an exigent circumstance," 2012 U.S. Dist. LEXIS 130248, at *6, Defendant claims that no such emergency or exigent circumstances were present in this case.

---

[5] The court need not reach the issue of whether such CSLI could be disclosed to law enforcement absent a warrant because the court has found sufficient justification to conclude there was an emergency in this case. It should be noted, however, that this is a developing area of law and the courts are not settled on this issue. *Compare generally Graham*, 846 F. Supp. 2d 384 *and* Garaufis 2011, 809 F. Supp. 2d 113; *see also In re Application of the United States. . . .* , 849 F. Supp. 2d 526 (D. Maryland 2011, Gauvey, Mag. J.).

The court finds to the contrary. Detective Spangenberg had probable cause to believe that Defendant was the individual who committed the Redwood Road robbery and the violent shooting of the clerk in the face at point blank range. Detective Merino, a gang unit detective familiar with Defendant, his family, and the general gang scene and affiliations in the area, had reviewed video footage of both the California Ave. beer run theft and the subsequent Redwood Road robbery/shooting and had positively identified Defendant as the prime suspect. Detective Spangenberg had independent experience with the gangs with which Defendant was believed to be associated and was also aware that the "beer run robbery" was one of the signature crimes known to be committed by such gangs. Based on the violence of the Redwood Road robbery, combined with his awareness of the "beer run robberies," it was entirely reasonable for Detective Spangenberg to conclude that given the two convenience store incidents that had already occurred, another might be imminently forthcoming. Also, he had been informed by knowledgeable gang unit detectives that Defendant was known to be violent and believed to be currently armed and dangerous. Under these emergency circumstances, Detective Spangenberg's application pursuant to 18 U.S.C. § 2702 was a reasonable way to proceed to obtain the suspect's cellphone GPS pinging data as quickly as possible, hopefully to help officers who were in the process of staking out Defendant's known hangouts.

### 2. *Related Independent Bases Justifying Warrantless Use of GPS Pinging Data*

#### a. *Exigent Circumstances Exception*

The Government also opposes Defendant's Motion to Suppress based on the well-established "exigent circumstances" exception to warrantless searches. (Govt.'s Resp. Mot. Suppr. 6-8 [Dkt. No. 98].) The Tenth Circuit has consistently applied the "exigent circumstances" exception to the warrant requirement "when the circumstances posed a

significant risk to the safety of a police officer or a third party." *United States v. Najar*, 451 F.3d
710, 717 (10th Cir. 2006). A two-part test applies: "whether (1) the officers have an objectively
reasonable basis to believe there is an immediate need to protect the lives or safety of themselves
or others, and (2) the manner and scope of the search is reasonable." The facts outlined in the
paragraphs above show that this test is easily met with Detective Spangenberg's decision to use a
Section 2702 application to obtain cellphone GPS pinging data on Defendant quickly from the
service provider without a warrant.

     b.    *Good Faith Exception*

     This issue ultimately pivots on the application of the good faith exception described in
*United States v. Leon*, 468 U.S. 897 (1984). *See United States v. Barajas*, 2013 U.S. App. LEXIS
4475, at *16 (10th Cir., March 4, 2013) (holding that the good faith exception applied where
officers relied in good faith on a wiretapping warrant that included GPS pinging data even
though the applications for the warrant did not specifically request such cellphone GPS pinging
data). That is, even if the court were required to find that Detective Spangenberg acquired the
CSLI in violation of Defendant's Fourth Amendment rights, the *Leon* good faith exception, as
further applied by *Illinois v. Krull*, 480 U.S. 340, 349 (1987), would remove suppression as an
available remedy. Under *Leon*, evidence obtained by law enforcement officers in objective good
faith reliance on a facially valid warrant is admissible even if the search warrant is ultimately
deemed invalid. 468 U.S. at 926. And under *Krull*, the exception applies if officers obtain
evidence in "objectively reasonable reliance on a statute." 480 U.S. at 349. In extending *Leon*
this way, the Supreme Court in *Krull*  reasoned that "[t]here is no basis for applying the
exclusionary rule to exclude evidence obtained when a law enforcement officer acts in
objectively reasonable reliance upon a statute, regardless of whether the statute may be

characterized as 'substantive' or 'procedural.'" *Id.* at 356 n.12; *See also United States v. Clarkson*, 551 F.3d 1196, 1204 (10th Cir. 2009) (noting that *Krull* extended the *Leon* good-faith exception to officers' good faith reliance on a statute's regulatory scheme permitting warrantless searches, even where the regulatory scheme was later declared unconstitutional).

Here, as in *Graham*, Defendant has not challenged the constitutionality of the SCA. 846 F. Supp. 2d at 405. Nothing would suggest that either the SCA or, more specifically, Section 2702(c)(4), were enacted by a legislature that had "wholly abandoned its responsibility to enact constitutional laws." *Krull*, 480 U.S. at 356. Even if Defendant were arguing that the SCA were unconstitutional as applied, which he does not appear to be doing, "other courts have concluded that suppression is inappropriate" where officers have acted in good faith reliance on its provisions. *Graham*, 846 F. Supp. 2d at 406 (citing cases). This court therefore agrees with *Graham* that it is "objectively reasonable for law enforcement to rely on the Stored Communications Act" in obtaining CSLI, as Detective Spangenberg did in reliance on the emergency provision of Section 2702 under these circumstances. *Id.*

### 3. *Inevitable Discovery*

The court is further persuaded by the Government's separate argument that, given the stakeout already underway at The Garage, Defendant would have been found and apprehended even without the assistance of the cellphone GPS pinging data obtained pursuant to 18 U.S.C. § 2702(c)(4). Even if law enforcement's warrantless action violates the Fourth Amendment, evidence should not be suppressed if the court is persuaded that "evidence sought to be suppressed is not 'fruit of the poisonous tree'" because it "would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *United States v. Sanchez*, 608 F.3d 685, 691

(10th Cir. 2010) (quoting *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)). "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it." *Id.* (citing *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005)).

Although Detective Spangenberg learned from the results of the cellphone pinging request that one of the phones was pinging in the area of The Garage location, the facts sufficiently demonstrate that this location was already being staked out by Detectives Wiley and Kobayashi. Defendant argues that the detectives were not in fact staking out The Garage but were patrolling more generally. The testimony and evidence proffered do not support this inference. Also, Defendant's argument that absent being informed of the "pinging" Detectives Wiley and Kobayashi would not have approached the three men they saw leaving The Garage at around 11:30 p.m. because it "would have alerted the gang members to the presence of the police and resulted in eluding capture altogether" is entirely unpersuasive. (Def.'s Reply Mot. Suppr. 4 [Dkt. No. 99].) This is pure speculation and, in fact, approaching the Defendant and his two companions (with or without the "pinging" information—it is irrelevant to the outcome here) did not alert the men in a way that caused Defendant to avoid being captured. The court is persuaded that based on the detectives staking out The Garage, discovery was inevitable here, and Defendant would have been taken into custody even absent the cellphone GPS pinging data.

**B**.    **Defendant's Other Grounds for Suppression**

In addition to Defendant's arguments based on the warrantless cellphone pinging, Defendant is moving this court to suppress evidence based on alleged defects in the actions of police in arresting Defendant on June 15, 2011, the interrogations of Defendant on June 16, 2011

and June 22, 2011, and the search of Defendant's apartment and evidence seized during that search.

### 1. Arrest of Defendant

Defendant argues that he was arrested without probable cause and therefore his arrest allegedly solely for the purpose of interrogating him violated the Fourth Amendment, citing *Dunway v. New York*, 442 U.S. 200 (1979). Defendant acknowledges, however, that "[p]olice may arrest when they have probable cause to believe that an offense has been committed. Probable cause exists when the police have knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in itself to warrant a belief by a prudent person that an offense has been or is being committed by a suspect." (Def.'s Mem. Supp. Mot. Suppr. 8 [Dkt. No. 95] (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).) This is where Defendant's argument on this point fails. As has been noted above, Defendant had been positively identified by Detective Merino, a gang unit detective familiar with Defendant, his family, and the gangs and/or associates with whom Defendant was affiliated.

In the California Avenue theft, surveillance footage shows Defendant speaking at length with the clerk, and his associates are seen stealing beer. Detective Merino viewed the footage from that incident and identified Defendant as the suspect talking with the clerk. He also compared that footage with the footage from the robbery and shooting at the Redwood Road 7-Eleven store and identified Defendant as the likely suspect in the Redwood Road 7-Eleven robbery and shooting based on numerous indicia. Thus, probable cause existed to arrest Defendant because of law enforcement's reasonable belief, based on video surveillance footage that allowed Detective Merino to identify him as the suspect, that he had committed the robbery/shooting on Redwood Road. Absent the footage from the California Ave. incident,

Defendant would likely have a stronger argument; however, by comparing the footage of the two

incidents occurring only a little more than an hour apart, Detective Merino was able to make a

positive identification. Detective Spangenberg and gang unit detectives involved in the

investigation believed that Defendant was armed and dangerous and potentially in the process of

preparing to commit further similar "beer run robberies" of convenience stores as a signature

crime. The court therefore denies Defendant's Motion to Suppress on the basis of alleged defects

in Defendant's arrest.

### 2.    The Interviews of Defendant on June 16, 2011 and June 22, 2011

Defendant argues that all evidence obtained as a fruit of the interrogations of Defendant

in the June interviews with police should be suppressed because Defendant was not properly read

his *Miranda* rights in either interview. Under *Miranda v. Arizona*, 384 U.S. 436 (1966), law

enforcement must inform any suspect in custody of certain rights and warnings before

proceeding with an interrogation or interview. Substantively, the information that law

enforcement must provide to suspects in custody includes the following: "He must be warned

prior to any questioning that he has the right to remain silent, that anything he says can be used

against him in a court of law, that he has the right to the presence of an attorney, and that if he

cannot afford an attorney one will be appointed for him *prior to any questioning* if he so

desires." *United States v. Pacheco*, 819 F. Supp. 2d 1239, 1244 (D. Utah 2011) (quoting

*Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259 (2010) (quotations and citation omitted) (emphasis

added)). "Importantly, no talismanic incantation is required to satisfy [*Miranda*'s] strictures.

Thus, courts need not examine *Miranda* warnings as if construing a will or defining the terms of

an easement. Instead, the inquiry is simply whether the warnings reasonably convey to a suspect

his rights as required by *Miranda*. In other words, warnings that convey the substance of the suspect's rights are sufficient." *Id.* at 1244-45 (internal quotation marks and citations omitted).[6]

    a.    *The First Interview, June 16, 2011*

The main problem with the *Miranda* warnings given during the first interview, argues Defendant, is that Detective Merino "failed to convey to [Defendant] that he could have an attorney present during questioning or that he could talk to a lawyer prior to any questioning." (Def.'s Mem. Supp. Mot. Suppr. 11 [Dkt. No. 95].) In the first interview, Detective Merino used the following language to convey the information required by *Miranda*: "You have the right to remain silent. Anything you say can and will be used against you in court. Do you understand that?", to which Defendant responded affirmatively. Detective Merino continued, "You have the right to an attorney. If you can't afford an attorney, one will be appointed to you by the courts free of charge to you." (Tr. Int. 6/16/2011, at 4, marked as Govt's Ex. 1a.) The court agrees that this warning was defective because it omitted reference to Defendant's right to have an attorney present during questioning, i.e. at the present time. Although Detective Merino's language does not expressly premise the right to an attorney on a future event or date, the formulation was sufficiently ambiguous to mask Defendant's right not to proceed with questioning at that moment until an attorney was present. The interview therefore violated Defendant's Fourth Amendment rights and information obtained during the interview must be suppressed.

However, this finding is of little help to Defendant because he denied involvement in the California Ave. theft and the Redwood Road robbery during the interview (a fact that also essentially moots Defendant's arguments as to involuntariness due to intoxication and other

---

[6] Defendant acknowledges that "there is no exact formulation of the Miranda warning which is required" or "talismanic incantation required to properly advise a suspect of his rights." (Def.'s Mem. Supp. Mot. Suppr. 10 [Dkt. No. 95] (citing *California v. Prysock*, 435 U.S. 355, 359-360 (1981)).) But Defendant does not cite *Pacheco*, a case with similar *Miranda* issues and questions about the voluntariness of *Miranda* waivers.

factors during that interview). At most, the first paragraph on page 4 of the search warrant affidavit must be stricken from that document.[7] But given that police computer records independently provided almost identical address information—most importantly, the correct apartment number in the complex at the approximate street address—and that police could visually observe the tattoos on his forearms, the removal of this language from the search warrant affidavit does not affect the probable cause expressed in the affidavit. Accordingly, though this paragraph is stricken from the affidavit, no evidence obtained in the search of Defendant's apartment must be suppressed because the court finds that the state judge had sufficient probable cause even in the absence of this language to issue the warrant.

    b.  *The Second Interview, June 22, 2011*

    Defendant alleges that the *Miranda* warnings in the second interview were also inadequate because of clumsy language about including any information learned during the interview "in the report." In giving the *Miranda* warnings, Detective Coats said "[a]nything you say I am going to put in the report and it could be used against you in court at a later time." (Tr. Int. 6/22/11, at 2, marked as Govt.'s Ex. 1b.) Defendant focuses closely on Detective Coats' reference to "the report," notes that *Miranda* does not mention a "police report" or "report," and informs the court that despite extensive research, defense counsel "has not been able to find a single case upholding a *Miranda* warning stating that a police report can be used at trial" or any case invalidating such a warning. (Def.'s Mem. Supp. Mot. Suppr. 16 [Dkt. No. 95].) Curiously, however, the *Miranda* warning in *Pacheco* was very similar: "Anything you tell me, I am going to put in the police report. That police report can be used in a court of law at a later date and time

---

[7] "An interview was conducted with Takai. Takai stated he goes by the nickname of 'Spin' and he has tattoos on both forearms. According to Takai, he stated he lives as 500 West 1500 South, apartment #1011 in Bountiful, Utah. Takai advised investigators that he has a pair of black jeans inside his apartment." (Affidavit for Search Warrant No. 1090081, at 4 [Dkt. No. 53-1].)

if need be, you understand that, right?" 819 F. Supp. 2d at 1242. In reviewing that language, this

court explained in *Pacheco* that "[w]hile it may be incorrect that the police report can be used at

trial, the focus of a *Miranda* inquiry is on whether a defendant was substantively informed that if

he gave up his right to remain silent, anything he said could be used against him in court." *Id.* at

1245. On this basis, this court found that "[t]he *Miranda* warning was less than ideal in this case.

Nevertheless, [the] incorrect statement does not void the substantive meaning of [the] warning.

Hence, the court concludes Pacheco was sufficiently warned of his rights and the potential

consequences of speaking." *Id.* The same holds true in this case with nearly identical language.

The court notes that it issued its decision in *Pacheco* in May 2011, a month before Defendant's

second interview; presumably, therefore, law enforcement in this District simply had not been

able to drop this particular formulation from their stock *Miranda* warnings yet in response to

*Pacheco*.

But *Pacheco* is also instructive on Defendant's other complaints about the second

interview, specifically that it was coercive to the extent of overriding Defendant's free will in

choosing to confess to both the California Ave. 7-Eleven theft and the Redwood Road 7-Eleven

robbery and shooting, as well as another unrelated robbery. (Def.'s Mem. Supp. Mot. Suppr. 16-

19 [Dkt. No. 95].) Defendant's allegations of coercive tactics in the second interview revolve

mainly around Agent Quirk and Detective Coats' various statements promising that they would

speak to prosecutors to recommend leniency if he would come clean and show remorse. The

transcript of the interview reveals numerous such statements. "The determination of

voluntariness is based on the totality of the circumstances. Relevant circumstances embrace both

the characteristics of the accused and the details of the interrogation. Notably, involuntariness in

the context of confessions requires a finding of coercive police action. The essence of

voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne." *Pacheco*, 819 F. Supp. 2d at 1245-46 (internal quotation marks and citations omitted). Moreover, "because [Defendant's] personal characteristics are relevant only if this court first concludes that the officers' conduct was coercive, the court looks at the details of the interrogation first." *Id.* (internal quotation marks and citations omitted).

In the interview, Agent Quirk and Detective Coats repeatedly made statements to the effect that there was a "chance to reduce the potential charges or sentencing" if he showed remorse and confessed. (*See, e.g.*, Tr. Int. 6/22/11, at 16-17.) The basis of such statements was that the investigators would recommend leniency to the prosecutors. And both Detective Coats and Agent Quirk repeatedly clarified that they did not have the authority to make promises, control the charges, the sentencing, or even whether the case would be filed in state or federal court, though they did encourage Defendant by saying that cooperation might help. (*See, e.g.*, *id.* at 21-23.) This court held in *Pacheco* that in an interrogation, officers may "speculate that such cooperation will have a positive effect" as long as they do not "go beyond limited assurances." 819 F. Supp. 2d at 1246 (internal quotation marks and citations omitted). The court finds that Agent Quirk and Detective Coats' statements, though to some extent "promises" (but not of leniency; rather, promises to speak to the prosecutors to recommend leniency), were carefully hedged to avoid going "beyond limited assurances." *Id.* Thus, the court finds there was no police misconduct in this interview that would justify looking further into specific characteristics of Defendant that could affect the voluntariness of his confessions where coercive police conduct has been found. *See United States v. Lopez*, 437 F.3d 1059, 1064 (10th Cir. 2006) ("personal

characteristics are relevant only if this court first concludes that the officers' conduct was coercive"). Accordingly, the confessions in the second interview will not be suppressed.

### 3.      *The Search of Defendant's Apartment and Seizure of Evidence*

Defendant's apartment was searched pursuant to a valid warrant based on probable cause. As has been discussed above, striking one paragraph from the search warrant affidavit as the result of the first interview in which defective *Miranda* warnings were given does not affect the probable cause otherwise appearing in the affidavit and justifying the state court judge's decision to sign the warrant. Accordingly, the court denies the Motion to Suppress any evidence obtained during the search of Defendant's apartment pursuant to the search warrant.

## CONCLUSION

As discussed above, the court DENIES Defendant's Motion to Re-open Evidentiary Hearing in re: *Franks v. Delaware* [Dkt. No. 74] and Renewed Motion for *Franks* Hearing [Dkt. No. 94]. Defendant's Motion to Supplement *Franks*' Proffer [Dkt. No. 69] is also hereby TERMINATED as moot. Also, the court GRANTS in part and DENIES in part Defendant's Motion to Suppress [Dkt. No. 47]. Defendant's Motion to Suppress is granted only insofar as the first paragraph on page 4 of the search warrant affidavit [*see* Dkt. No. 53-1] must be stricken based on the defective *Miranda* warnings given in the interview of Defendant on June 16, 2011. The rest of Defendant's Motion to Suppress, however, is DENIED.

DATED this 30th day of April, 2013.

BY THE COURT:

_____

Clark Waddoups
United States District Judge

21